## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION, YOUNGSTOWN

EAST PALESTINE CITY SCHOOL DISTRICT
BOARD OF EDUCATION,

> Plaintiff,

v.

NORFOLK SOUTHERN CORPORATION,
NORFOLK SOUTHERN RAILWAY COMPANY,

> Defendants.

Case No. 4:25-cv-00862

**Complaint with Jury Demand**

### INTRODUCTION

Plaintiff East Palestine City School District Board of Education alleges the following against Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company ("Norfolk Southern"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

### NATURE OF ACTION

1. This action seeks to recover the losses incurred by the East Palestine City School District as a result of the train derailment on February 3, 2023 and its short- and long-term aftermath. Since the derailment, Norfolk Southern has reported over $16 billion dollars in profits (not revenue, *profits*). It achieved those substantial gains because it has privatized the profits of its operations while socializing the costs of the trainwreck on to the local community, including the Board of Education, for years to come.

2.      The operating budget of the schools relies on local property and income taxes. The impact of the diminution in property values and the lost income of residents to the School District, both to date and continuing into the future, should—in fairness and based on its repeated commitments to the community—be borne fully and completely by Norfolk Southern. Yet the community continues to absorb the costs of this disaster in the form of lost operating revenue to the School District.

3.      Norfolk Southern failed to fulfill its commitment to reimburse the School District for the costs incurred as a result of the derailment, including for housing and transporting residents displaced by the mandatory evacuation orders and the use of its school facilities during the emergency response.

4.      Norfolk Southern further failed to fulfill its promise to invest in the community by building a community wellness and development center on School District property and relocating and rebuilding the existing athletics facilities.

5.      The School District, and the students it serves, have been harmed by Norfolk Southern's failure to meet its obligations and fulfill its promises and remediate the continuing impact of the derailment. In short, Norfolk Southern has not "made it right" as it promised to do.

## PARTIES

6.      Plaintiff East Palestine City School District Board of Education is duly elected and constituted per Ohio Rev. Code §§ 3311.02 and 3313.02.

7.      Defendant Norfolk Southern Corporation ("NSC") is a corporation formed in Virginia with its headquarters and principal place of business in Atlanta, Georgia.

8.     Defendant Norfolk Southern Railway Company ("NSRC") is a wholly owned subsidiary of NSC. NSRC is a Class I railroad corporation formed in Virginia with its headquarters and principal place of business in Atlanta, Georgia.

9.     Upon information and belief, NSRC has consistently held itself out as conducting business affairs as a conduit for NSC in connection with the ownership and operation of their railway enterprise. Additionally, NSC and NSRC constituted a joint venture in connection with their railway enterprise in that they agreed to undertake ownership and operation of the enterprise jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed their respective skills, property or resources in exercising control or right of control over the facilities.

10.     Defendants are referred to collectively as "Norfolk Southern" throughout this complaint.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court has jurisdiction over Defendants because they systematically transact and conduct business in Ohio, including by transporting hazardous materials by train, from which they derive substantial revenue. Norfolk Southern expected, or should have expected, that its acts would have consequences within Ohio. Norfolk Southern committed the tortious acts complained of in this State, causing injuries within this State.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District.

FACTUAL ALLEGATIONS

**The Derailment**

14.     Norfolk Southern's Keystone–Fort Wayne Line runs through the Village of East Palestine. About 46 trains pass through this community each day.

15.     At all relevant times, it was Norfolk Southern's exclusive obligation to ensure that the railcars it was transporting were in proper working order.

16.     On Friday February 3, 2023, at approximately 8:54 p.m., Norfolk Southern Railway Train 32N derailed 38 mixed freight railcars in East Palestine, at milepost 49.5 on the Norfolk Southern Fort Wayne Line of the Keystone Division, about a quarter-mile west of the Ohio-Pennsylvania line (Latitude: 40.8360864°N, Longitude: -80.5215884°W).

17.     The derailment occurred because a bearing on a hopper car overheated and caused an axle to separate.

18.     The hopper car—GPLX75465—had been in service for more than 25 years at the time of the derailment.

19.     Overheated bearings occur when inadequate lubrication, component misalignment, or mechanical damages increase bearing friction.

20.     There are temperature detectors on the Keystone–Fort Wayne Line that measure and record the temperature of each railcar wheelset as the train passes through ("hot box detectors").

21.     At the time of the derailment, it was or should have been known to Norfolk Southern that the hot box detectors it chose to employ measure temperature on the exterior of the bearing cap and tend to lag behind temperature changes in the bearing's interior, taking 30–60 minutes to accurately reflect an internal temperature increase from a reading taken on the exterior bearing cap.

22.     The other main type of wayside bearing detectors besides hot box detectors are acoustic bearing detectors. They monitor bearings for potential flaws by evaluating each bearing's acoustic signal as it passes wayside microphones. They are intended to identify early signs of bearing degradation and allow rail companies to meet their obligation to service or replace bearings before they fail.

23.     Norfolk Southern chose not to employ acoustic bearing detectors on its Keystone–Fort Wayne Line.

24.     The final three hot box detectors the train passed before derailment are pictured below (as depicted in the National Transportation Safety Board's Railroad Investigation Report RIR-24-05, *Norfolk Southern Railway Derailment and Hazardous Materials Release, East Palestine, Ohio, February 3, 2023* (June 25, 2024) ("NTSB Report")):[1]

---

[1] Plaintiff does not incorporate or allege the truth of any aspect of the NTSB Report except as specifically alleged in this Complaint.



**Figure 3.** Map of final three HBDs encountered before derailment.

25.     As the train passed through Sebring (30 miles west of the derailment), the hot box detector recorded a temperature of 38°F above ambient temperature on the right side of the hopper car. On the left side, the temperature was measured at 20°F above ambient temperature. Despite the increased and differential temperatures on the respective sides of the car, no alarm sounded and no alert was transmitted.

26.     The next hot box detector was in Salem (20 miles west of East Palestine). It recorded a consistent right-side temperature of 30°F above ambient temperature on the hopper car. The left-side temperature, however, was 103°F above ambient temperature.

27.     Norfolk Southern's above-ambient threshold for a "non-critical alert" was 90°F.

28.     Norfolk Southern chose to adopt procedures that do not alert the train's crew or require them to stop and inspect the train under the circumstances encountered on February 3, 2023. This procedure was plainly inadequate, as at the

same time as the hot box detector recorded this "non-critical" temperature on wheelset #1 of the hopper car, it was already visibly on fire as seen in the following still shot from surveillance video in Salem (as depicted in the NTSB Report):



**Figure 5.** Fire on wheelset #1 of the hopper car passing through Salem, Ohio.

29.     Norfolk Southern's standard operating procedures and the spacing it chose between its hot-bearing detectors transmitted only a low-priority alert that did not reflect the true condition of the failing bearing.

30.     Procedures that do not alert a train's crew that a wheelset is literally on fire are plainly inadequate to ensure safe operation of a train.

31.     Norfolk Southern had 20 miles of track on which to stop the train before it derailed in East Palestine.

32.     Norfolk Southern instead, consistent with its inadequate procedures, continued to operate the train for an additional 40 minutes after it was already on fire before it derailed.

33.    Had Norfolk Southern adopted proper procedures, this disaster would have been avoided.

34.    The "non-critical alert" from the drastic increase in temperature on the hopper car's left-side bearing between Sebring and Salem was transmitted to Norfolk Southern's Wayside Help Desk in Atlanta, Georgia. At the Help Desk, Norfolk Southern decided to have a single analyst working 12-hour shifts to monitor the entire rail system. The analyst on duty did not see the alert from the Salem hot box detector because he was working on another problem.

35.    Staffing the Help Desk with just one employee was plainly inadequate to monitor the operations of the entire rail system. It was foreseeable that two problems could occur at the same time on different trains. Norfolk Souther's decision the understaff the Help Desk was based on maximizing its profits at the expense of rail safety.

36.    When the train reached the East Palestine hot box detector 20 miles after the "non-critical alert" while the train was on fire, the detector recorded the maximum temperature (253˚F above ambient temperature). The temperature may have been higher.

37.    The maximum-temperature reading from the hot box detector triggered a "critical alarm" and finally alerted the train's crew to the fact that the hopper car was aflame. The crew began to slow the train. But it was too late.

38.    A total of 38 railcars derailed. The derailed equipment included 11 tank cars carrying hazardous materials.

39.    Three of those 11 tank cars, carrying flammable and combustible hazardous materials, were mechanically breached during the derailment and released cargo.

40.    Those three cars, and 32 others, caught fire in the ensuing conflagration.

41.    One of the breached cars contained butyl acrylates, which spilled on to the ground and burned in a ditch beside the tracks for hours.

42.    The ditch fire ignited lading from tank cars containing butyl acrylates, ethylene glycol monobutyl ether, 2-ethylhexyl acrylate, propylene glycol, diethylene glycol, and petroleum lubricating oil; hopper cars containing plastic pellets (polyethylene and polyvinyl); and box cars containing various freights.

43.    Five of those 11 cars were carrying vinyl chloride monomer, a compressed liquified flammable gas. Those cars were not mechanically breached during the derailment but were exposed to fires and released materials from pressure-relief devices over the next day.

44.    Norfolk Southern delayed transmitting train-consist information to emergency responders, increasing responders and the public's exposure to post-derailment hazards and limiting their ability to safely and effectively respond.

45.    Norfolk Southern did not immediately provide information about the railcars' contents in response to the East Palestine dispatch's request to the Norfolk Southern dispatch in Atlanta.

46.     During this same window of time, Norfolk Southern dispatch did communicate with the train crew, authorizing them to separate the lead locomotives and move them away from the fire (thus protecting Norfolk Southern's property).

47.     The initial incident commander—the East Palestine deputy fire chief— never received a physical or electronic copy of the train's manifest. He reported to NTSB that he learned that there was vinyl chloride and benzene on the train by "word of mouth."

48.     In the immediate aftermath of the derailment and resulting chemical fires, local officials issued an urgent warning advising those within one mile of the crash site to evacuate.

49.     The following image from the NTSB Report depicts the resulting fire:



**Figure 1.** Overhead view of derailment and early fire. (Courtesy of Eric's Train Yard.)

50.     At midnight, the Norfolk Southern northern regional hazmat manager advised the deputy fire chief to suspend fire-suppression activities and withdraw

personnel and equipment to a safer distance. The deputy fire chief complied and relocated the command post to the combined fire and police station a mile away.

51.     The East Palestine fire chief, who was on leave at the time of the derailment, arrived on scene at 2:00 a.m. and assumed the role of incident commander from his deputy. And fire-suppression activities resumed in the early morning but were again ceased.

## Norfolk Southern's Unnecessary Vent-and-Burn Plan

52.     At around midnight on February 4, 2023, a pressure release device on one of the railcars of vinyl chloride actuated.

53.     Pressure-release-device actuation occurs when the pressure inside a tank reaches a pressure high enough to open the valve. The valve closes when the tanks pressure falls low enough for the valve to close. For railcars exposed to a pool fire, the pressure release device cycles through multiple times.

54.     Four of the five vinyl-chloride cars experienced pressure-release-device cycling, which ceased by approximately 6:45 p.m. on February 4.

55.     In the meantime, Norfolk Southern communicated with the manufacturer of the vinyl chloride—OxyVinyls—about the risk of explosion. In addition to providing support remotely, by having experts available to answer questions relating to the potential for vinyl chloride to polymerize, OxyVinyls sent three employees to the scene of the derailment to assist on site.

56.     OxyVinyls assessed the risk of explosion through polymerization as low and recommended monitoring for an increase in temperature along with modeling to assess the possible consequences of a tank car failure.

57. By that time, however, Norfolk Southern and its agents were already considering a vent and burn for all five vinyl-chloride cars because it was the quickest way to get trains running on the tracks again.

58. In a vent and burn, a tank car is punctured with explosives at the highest point in the tank to reduce the pressure in the tank car, then punctured with explosives at the lowest point in the tank to release the contents, which are directed through a trench and burned in a pit.

59. There are multiple ways to release the contents of a railcar (*e.g.*, product transfer, flaring, and a hot tap).

60. According to the United States Department of Transportation, Federal Railroad Administration's Handbook for Vent and Burn Method of Field Product Removal (1994), a vent-and-burn tactic is the last resort to unload a damaged tank car, to be used "only when all other emergency product removal methods have been considered and rejected, and the consequences of not relieving the internal tank car pressure are determined to be greater than using this procedure."

61. Temperature monitoring of the five vinyl-chloride cars by a Norfolk Southern contractor revealed that four of the five were stable and one was elevated (though was progressing in a downward direction through the eventual implementation of the vent and burn). Norfolk Southern, however, took the position that it was not confident in the measured readings and suspected that the readings were low. The vinyl-chloride manufacturer disagreed and consistently maintained its

position that polymerization was not occurring (meaning there was no risk of explosion and thus no need to breach the tanks).

62.     Norfolk Southern and its agents recommended, authorized, and carried out the vent and burn of the five vinyl-chloride railcars.

63.     On the morning of Sunday, February 5, 2023, the incident command site was relocated to East Palestine Elementary School and Board Offices to accommodate the personnel on the scene. Plaintiff cooperated with Norfolk Southern in making school facilities available. School employees, some of whom worked around the clock, through the weekend, and overnight, answered Norfolk Southern's call for assistance and ensured that the facilities were functioning and available for disaster-response efforts. Evacuated East Palestine residents were housed in the middle and high schools. Incident command left the facilities on or about February 12, 2023.

64.     As a result of Norfolk Southern's use of the facilities, the elementary school parking lot was damaged. Additionally, the middle and high school gymnasium floors were damaged.

65.     The vent-and-burn plan was implemented by the incident commander managing the response based on information provided by Norfolk Southern and conveyed at a meeting at around noon on February 6.

66.     OxyVinyls was not invited to or at the meeting and its dissenting opinion (that there was not, in fact, polymerization occurring, meaning the vent and burn was not necessary) was not communicated to the incident commander before he approved the vent and burn.

67. The vent-and-burn procedure was not necessary to prevent explosion of the railcars containing vinyl chloride, as indicated by on-scene temperature trends and subsequent examinations.

68. Norfolk Southern and its agents described explosion or the polymerization of vinyl chloride as an imminent threat when expert opinions and available evidence should have led them to reconsider their course of action.

69. Norfolk Southern compromised the integrity of the decision to vent and burn the tank cars by not communicating expertise and dissenting opinions to the incident commander making the final decision.

70. Norfolk Southern and its agents inaccurately represented that the tank cars were at risk of catastrophic failure from a polymerization reaction, which created unwarranted urgency and led to the unnecessary decision to vent and burn the vinyl-chloride railcars.

71. Relying on information conveyed by Norfolk Southern, government officials in Ohio and Pennsylvania ordered evacuation of the surrounding area and advised residents that the conditions could cause an explosion with the potential of deadly shrapnel traveling up to a mile.

72. The governors of the State of Ohio and the Commonwealth of Pennsylvania later extended the evacuation zone to a one-mile by two-mile area surrounding the derailment site (pictured below).



73.     The governors ordered this mandatory evacuation in advance of Norfolk Southern implementing its vent and burn. The governors advised that Norfolk Southern's plan would release fumes into the air that could be deadly if inhaled. Again relying on information from Norfolk Southern, the governors warned that anyone who remained in the red evacuation zone faced grave danger of death; those in the yellow zone were advised by the governors that they were at high risk of severe injury, including skin burns and serious lung damage.

74.     Before implementing the vent-and-burn plan urged by Norfolk Southern, the incident commander was given just 13 minutes to approve Norfolk Southern's proposed course. Norfolk Southern attributed this suddenly urgent time constraint to avoiding the effects of atmospheric temperature inversion, though its true motive was to clear the tracks as fast as possible to resume its operations. The incident commander asked Norfolk Southern's contractors to explain why the vent

and burn was necessary. The contractors explained that if a tank car's pressure rose to 150˚F, they would withdraw personnel from the area and cease any effort to prevent an uncontrolled explosive tank rupture.

75.     But by the time of this meeting, the highest tank car temperature had fallen from 138˚F the previous afternoon to 126˚F. Norfolk Southern and its agents nevertheless urged the vent and burn procedure as the only option to prevent catastrophic failure of a tank car, leading the incident commander to consent.

76.     Norfolk Southern did not disclose that its main concern in pushing for the vent and burn was to reopen the tracks and resume its operations.

77.     Norfolk Southern exaggerated and misrepresented the risk of polymerization to obtain the incident commander's approval.

78.     A Norfolk Southern contractor breached the vinyl-chloride cars at 4:37 p.m. on February 6, 2023, releasing and igniting their lading.

79.     Burning the vinyl chloride resulted in a column of black smoke that grew into a persistent cloud containing soot particles, carbon dioxide, carbon monoxide, hydrogen chloride, and a trace of phosgene (a toxic gas).

80.     The following image from the NTSB Report shows the resulting plume of toxic smoke:



**Figure 10.** The vent and burn 3 minutes after detonation. (Courtesy of NS.)

81.     No more than three hours after the vent-and-burn, then-CEO of Norfolk Southern Alan Shaw told at least one colleague that the site smelled like "burnt plastic" and a "frat house basement," and complained that he couldn't "get the smell

off" of himself because "it's in [his] hair." He and the colleague opined that "someone's weekend is ruined with the beer not making it to the destination" in time for the Super Bowl, as several boxcars of beer were destroyed.

82. Several Norfolk Southern agents told reporters and officials in the immediate aftermath of the vent and burn that they observed what they believed to be vinyl chloride polymer exiting the tank cars while viewing real-time video feeds of the vent and burn procedure.

83. Subsequent scientific analysis of the tank cars confirmed that no polymerization occurred. In other words, the tank cars were *not* at risk of explosive rupture due to polymerization, as the OxyVinyls officials had advised.

**The Aftermath of the Unnecessary Vent and Burn of Vinyl Chloride**

84. East Palestine's schools were closed from February 6–10, 2023 as a result of the derailment and subsequent vent and burn, including sheltering displaced residents in its facilities.

85. Norfolk Southern resumed rail service through East Palestine on February 8, before residents in the evacuation zone were permitted to return to their homes and before the schools could resume their educational mission.

86. The campus of the East Palestine City Schools is situated to the northwest of the derailment site and outside the evacuation zone.

87. In the immediate aftermath of the derailment, the Board of Education responded to requests from Norfolk Southern to assist in transporting and housing evacuated residents in its facilities. District buses went door-to-door to evacuate residents from their homes and transport them to the schools for emergency shelter.

88.     Akron Children's Hospital provided East Palestine's teachers and staff with professional development training focused on trauma and its impact on students to assist them with processing the disaster in their community.

89.     Plaintiff was not able to request federal public assistance from the Federal Emergency Management Agency (FEMA) because President Joe Biden did not issue a Major Presidential Disaster Declaration relating to the East Palestine derailment, in part because Norfolk Southern repeatedly represented that it would cover all costs relating to the damage and community needs (as detailed more fully below). It was reasonable for government authorities to rely upon the clear and unequivocal promises of Norfolk Southern that it would cover all the costs of the derailment.

90.     Norfolk Southern personnel repeatedly assured Board of Education staff that Norfolk Southern would reimburse the Board for the costs associated with the use of its facilities and equipment. Norfolk Southern has not fulfilled its promises to do so.

91.     Norfolk Southern has issued numerous press releases and made other public statements announcing its commitment to help the community recover and thrive in the derailment's aftermath, specifically referencing the schools.

92.     The derailment upended the lives of the residents of East Palestine and the community has yet to recover or thrive. East Palestine remains affected by the perception of contamination with residents and former residents expressing concern about the long-term health consequences of proximity to the trainwreck and chemical

fires. The risk of additional residents relocating will impact the School District's operations.

93.     On February 16, 2023, then-CEO of Norfolk Southern Corporation Alan H. Shaw promised not to "walk away" from the community: "I know you also have questions about whether Norfolk Southern will be here to help make things right. My simple answer is that we are here and will stay here for as long as it takes to ensure your safety and to help East Palestine recover and thrive…We will not let you down."

94.     On February 17, 2023, Norfolk Southern issued a press release assuring that "Norfolk Southern is deeply committed to the cleanup work to ensure that East Palestine's residents and natural environment not only recover but thrive. The press release quoted Mr. Shaw: "Our company will be working tirelessly every day to get East Palestine back on its feet as soon as possible. We know we will be judged by our actions, and we are taking this accountability and responsibility very seriously."

95.     The following day brought another press release quoting Mr. Shaw: "We are going to do the right things to help East Palestine recover and thrive again."

96.     On February 20, 2023, Norfolk Southern issued another press release announcing the launch of its website "NSMakingitRight.com" for the East Palestine community.[2] The release of the "Making it Right" website included another quote from Mr. Shaw: "I want residents of East Palestine to know that Norfolk Southern will be in their community to help for as long as needed."

---

[2] Plaintiff does not incorporate or allege the truth of any aspect of the "NSMakingitRight.com" website except as specifically alleged in this Complaint.

97.     Two days later, Norfolk Southern again promised that it "remains committed to the people of the community and will continue its work to help them thrive," touting its efforts to "engage the community."

98.     On February 24, 2023, Norfolk Southern issued a press release announcing that it had met with School District officials and was donating $300,000 to the East Palestine Schools related to concerns about the cancellation of athletic events as a result of the incident and the corresponding loss of revenue the District had sustained. Mr. Shaw stated: "As soon as I heard that the East Palestine Bulldogs were not able to play in revenue-generating games, we took immediate action to help this community. We continue to be committed to helping East Palestine residents get back on their feet. We are in this community for the long haul, and our goal is to see the community thrive again." The press release also stated: "Norfolk Southern has committed that this initial donation of $300,000 to the East Palestine City School District will be followed by additional, future financial support." This "initial donation" and Norfolk Southern's public statements about "additional, future financial support" led the Board to believe it could reasonably rely upon promises made by Norfolk Southern to reimburse the School District for the costs associated with the derailment and resulting disruption as well as abide by its word as to build the community center on school grounds and otherwise support the School District financially to recover from the long-term costs of the derailment and its aftermath.

99.     In a press release issued March 9, 2023, Norfolk Southern shared its CEO's testimony before the United States Senate Committee on Environment and

Public Works. It included the following: "I am deeply sorry for the impact this derailment has had on the people of East Palestine and surrounding communities, and I am determined to make it right...Financial assistance cannot change what happened, but it is an important part of doing the right thing...I want to be clear: this financial assistance is just a down payment. I've met with...school officials...to begin to identify ways we can invest in the future prosperity of East Palestine and support the long-term needs of its people. We will continue to invest in East Palestine for as long as it takes to help the community recover and thrive...I want the people of East Palestine and the surrounding communities to know that Norfolk Southern and I are deeply committed to them and their recovery...Again, this is a down payment. I am going to see this through. There are no strings attached to our assistance...I understand how much East Palestine means to each resident, and we are committed to making this right...On behalf of the more than 19,700 hard-working employees of Norfolk Southern, I pledge that we won't be finished until we make it right."

100.   The press releases continued on March 14, 2023: "Every day since the derailment, our goal has been to make it right for the people of East Palestine and the surrounding communities. We are making progress every day cleaning the site safely and thoroughly, providing financial assistance to residents and businesses that have been affected, and investing to help East Palestine and the communities around it thrive."

101.   On March 22, 2023, Norfolk Southern issued a press release sharing its CEO's testimony before the United States Senate Committee on Commerce, Science,

and Transportation. The CEO echoed the sentiments and assurances previously expressed: "I am deeply sorry for the impact this derailment has had on the people in the region, and I am determined to make it right… Financial assistance cannot change what happened, but it is an important part of doing the right thing… I want to be clear: this financial assistance is just a down payment. I have visited East Palestine and the surrounding area frequently since the accident. I've met with… school officials… to begin to identify ways we can invest in the future prosperity of the residents in the area and support the long-term needs of its people. We will continue to invest in the affected communities for as long as it takes to help people in the area to recover and thrive.

102.    The Board of Education was quite reasonably persuaded by the consistent and unequivocal public statements of Norfolk Southern's CEO, which was the same message its personnel were delivering to Board employees.

103.    One of the promises that Norfolk Southern made to the Board was to build a community wellness center on school property, including relocating and rebuilding its existing athletic facilities (which are located on the planned site of the wellness center).

104.    In reliance on this promise and per Norfolk Southern's request, the Board and school personnel undertook substantial steps in furtherance of this plan. The Board complied with Norfolk Southern's request to engage stakeholders and create a Steering Committee for the wellness center, which held a number of meetings and generated input from students and community members about what the wellness

center should contain and what services it should provide. District personnel devoted substantial employee time to this endeavor, meeting at Norfolk Southern's request with various contractor and architect personnel, permitting soil sampling of its property for analysis, and making site visits to other community centers in the region to explore the options (alongside Norfolk Southern personnel who flew in from Atlanta for the site visits).

105.   To date, Norfolk Southern has not fulfilled its promise to build the community center or relocate and rebuild the athletic facilities.

106.   The general contractor Norfolk Southern engaged for the project estimated the total cost of the project at over $30,000,000.

107.   According to publicly available data collected by the Ohio Department of Education, during the 2023–24 school year, 243 students residing in the East Palestine School District chose to enroll in neighboring school districts by means of open enrollment. The financial impact from the resulting decline in enrollment equates to approximately $1.5 million dollars in annual school district revenue.

108.   As total student enrollment decreases as a result of the derailment, Plaintiff will obtain less funding from federal and State sources, while fixed operating costs for its facilities will likely increase.

109.   Norfolk Southern has not fulfilled its repeated promises to "make it right" for the School District. "Making it Right" would mean reimbursing the schools for the natural and foreseeable consequences of the trainwreck disaster—from the disaster-relief support the District provided, to fulfilling the commitment to the build

the wellness center, to covering the lost operating revenue the School District has and will continue to experience in the aftermath from lost enrollment to reduced income- and property-tax funds. The students of East Palestine deserve nothing less.

**CLAIMS FOR RELIEF**

**CLAIM 1: NEGLIGENCE**

110.    Plaintiff restates the preceding paragraphs.

111.    Under federal and state law, Norfolk Southern had a duty to use reasonable care to conduct its operations in transporting hazardous and toxic chemicals, including, but not limited to, the following duties:

a.    Operating, maintaining, inspecting, and/or repairing the railway and railcars to ensure their safety and proper operation;

b.    Ensuring alarms and other systems for monitoring malfunctions of the railway to prevent derailments;

c.    Ensuring proper safety procedures in the event of a mechanical malfunction of equipment;

d.    Ensuring proper mechanism(s) for stopping malfunctioning railcars without derailment;

e.    Avoiding overloading the train with excessive railcars or materials;

f.    Selecting train cars that are sufficiently resilient;

g.    Using placards that survive accidents and fires to identify hazardous materials;

h.    Loading the railcars consistent with accepted practice;

i.      Loading the railcars to avoid placements of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

j.      Having an adequate number of staff on board for purposes of planning, coordinating, overseeing, and monitoring transport;

k.      Hiring, training, managing, and supervising agents and employees;

l.      Properly determining the qualifications and capabilities of agents and employees;

m.      Properly determining the adequacy and skill of agents and employees;

n.      Ensuring that agents and employees were properly and adequately instructed and trained;

o.      Properly instructing and adequately training agents and employees concerning safety and emergency procedures in the event of a possible derailment;

p.      Properly alerting agents and employees to information crucial to the performance of their duties, *e.g.*, timely advising the train crew when a train is literally on fire;

q.      Routing railcars to avoid populated areas to minimize the risk of accidental exposure to hazardous materials;

r.      Adequately warning those in danger of exposure to hazardous materials;

s.     Instituting proper procedures and training for response to mechanical malfunction of a railcar;

t.     Instituting proper procedures and alarms to identify and address fire on a railcar;

u.     Instituting proper procedures and training to deploy the emergency brake in the event of a mechanical malfunction;

v.     Instituting proper procedures and training to deploy the emergency brake in the event of a fire on a railcar;

w.     Instituting proper procedures and training for response to derailment;

x.     Instituting proper procedures and training for advising emergency responders of the contents of railcars in the wake of a derailment;

y.     Instituting proper procedures for timely notifying governmental authorities of a derailment;

z.     Instituting proper procedures in the event of a derailment to avoid exposing the environment to hazardous materials;

aa.     Timely implementing an emergency-response plan in the event of a derailment;

bb.     Transporting and handling dangerous chemicals so as not to cause harm to Plaintiff, as Plaintiff was a foreseeable victim located within the zone of danger of Norfolk Southern's conduct;

cc.     Properly disposing of or otherwise eliminating the hazardous materials from the derailment site, including avoiding the use of techniques that further exposed the community to hazardous chemicals during a vent and burn of vinyl chloride;

dd.     Containing the spread of hazardous chemicals and by-products—including vinyl chloride, butyl acetate, benzene, phosgene, hydrogen chloride, and other combustible liquids—into the air, water, and soil;

ee.     Accurately and completely communicating expertise and dissenting opinions about the proper course of action to the incident commander;

ff.     Investigating the causes of its disproportionate number of derailments relative to its competitors and implementing appropriate remedial measures to avoid future derailments; and

gg.     Implementing policies and procedures and making decisions about operational safety that do more than comply with the bare minimum of federal or State requirements.

112.    Norfolk Southern breached its duties to Plaintiff in at least the following ways:

a.      Failing to operate, maintain, inspect, and/or repair the railway and railcars to ensure their safety and proper operation;

b.      Failing to ensure alarms and other systems for monitoring malfunctions of the railway to prevent derailments;

c.    Failing to ensure proper safety procedures in the event of a mechanical malfunction of equipment;

d.    Failing to ensure proper mechanism for stopping malfunctioning railcars without derailment;

e.    Failing to avoid overloading the train with excessive railcars or materials;

f.    Failing to load the railcars consistent with accepted practice;

g.    Failing to load the railcars to avoid placements of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h.    Failing to select railcars that are sufficiently resilient in the event of the common occurrence of derailment;

i.    Failing to use placards that survive accidents and fires to identify hazardous materials;

j.    Using DOT-111 tank cars to transport flammable liquids and hazardous materials after the NTSB had recommended their removal from flammable liquids service;

k.    Failing to have an adequate number of staff on board for purposes of planning, coordinating, overseeing, and monitoring transport;

l.    Failing to hire, train, manage, and supervise agents and employees;

m.     Failing to properly determine the qualifications and capabilities of agents and employees;

n.     Failing to properly determine the adequacy and skill of agents and employees;

o.     Failing to ensure that agents and employees were properly and adequately instructed and trained;

p.     Failing to alert the train crew in a timely fashion that the train was on fire and should be stopped;

q.     Failing to properly instruct and adequately train agents and employees concerning safety and emergency procedures in the event of a possible derailment;

r.     Failing to route railcars to avoid populated areas to minimize the risk of accidental exposure to hazardous materials;

s.     Failing to adequately warn those in danger of exposure to hazardous materials;

t.     Failing to institute proper procedures and training for response to mechanical malfunction of a railcar;

u.     Failing to institute proper procedures and alarms to identify and address fire on a railcar containing hazardous materials;

v.     Failing to institute proper procedures and training to deploy the emergency brake in the event of a mechanical malfunction;

w.      Failing to institute proper procedures and training to deploy the emergency brake in the event of a fire on a railcar containing hazardous materials;

x.      Failing to institute proper procedures and training for response to derailment, including advising emergency responders of the contents of railcars;

y.      Failing to institute proper procedures for timely notifying governmental authorities of a derailment;

z.      Failing to institute proper procedures in the event of a derailment to avoid exposing the environment to hazardous materials;

aa.     Failing to timely implement an emergency-response plan in the event of a derailment;

bb.     Failing to transport and handle dangerous chemicals so as not to cause harm to Plaintiff, as Plaintiff was a foreseeable victim located within the zone of danger of Norfolk Southern's misconduct;

cc.     Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including avoiding the use of techniques that further exposed Plaintiff and the properties in the community to phosgene and hydrogen chloride during a vent and burn of vinyl chloride;

dd.     Failing to contain the spread of hazardous chemicals and by-products—including vinyl chloride, butyl acetate, benzene, phosgene, hydrogen chloride, and other combustible liquids—into the air, water, and soil;

ee.     Failing to investigate the causes of its disproportionate number of derailments relative to its competitors and implement appropriate remedial measures to avoid future derailments;

ff.     Failing to reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous substances—including vinyl chloride, butyl acetate, benzene, phosgene, hydrogen chloride, and other combustible liquids;

gg.     Recommending, conducting, or authorizing a vent-and-burn procedure that was not necessary;

hh.     Failing to accurately and completely communicate expertise and dissenting opinions to the incident commander on the scene;

ii.     Prioritizing resuming operations over the short- and long-term consequences of a vent and burn to the community;

jj.     Failing to comply with the reasonable standard of care necessary for safety; and

kk.     Otherwise unreasonably causing injury to Plaintiff in ways further investigation, discovery, and subsequent revaluation of property and reduction in income taxes will reveal.

113.    Norfolk Southern owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, which it had previously blocked shareholder efforts to monitor and improve.

114. Norfolk Southern owed and breached a duty of reasonable care commensurate with the release and burning of hazardous chemicals, including the resultant release of phosgene and hydrogen chloride into the air, water and soils.

115. Given the significant likelihood of contamination of neighboring areas and exposure to their residents, Norfolk Southern had a duty to investigate the extent to which the "vent and burn" of hazardous material was likely to contaminate the air, water, and soil to levels that would materially increase residents' concerns of developing cancer and other latent diseases.

116. The damages sustained by Plaintiff were caused or exacerbated by the fact that Norfolk Southern failed to take necessary actions to mitigate the dangers associated with its operations.

117. As a direct and proximate result of Norfolk Southern's release of hazardous materials, Plaintiff's property, and the properties from which it derives its operating revenue, were physically invaded by Norfolk Southern's toxic discharges.

118. As a direct and proximate result of Norfolk Southern's negligence, Plaintiff, and the properties from which it derives its operating revenue, suffered property damages as alleged herein, including physical injury to its property; as corroborated by the presence of odor, visible mists and droplets on properties, and residents' health symptoms, including nausea, headaches, vomiting, dizziness, light-headedness, and nosebleeds; as well as by meteorological and atmospheric analysis of the toxic plume invading those properties.

119.   As a result of Norfolk Southern's toxic discharges, Plaintiff and its personnel were pressed into service to respond to the disaster created by Norfolk Southern. The displacement, inconvenience, and relocation of residents—to date and continuing into the future—were a direct and proximate result of Norfolk Southern's negligence.

120.   As a direct and proximate result of Norfolk Southern's negligence, Plaintiff suffered and will continue to suffer the loss of the quiet use and enjoyment of its property.

121.   As a direct and proximate result of Norfolk Southern's negligence, Plaintiff has suffered and will continue to suffer legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate (its own and that from which it derives its operating revenue), diminution in income-tax revenue from lost wages of continued residents and relocation of tax base, the cost to repair the damage and restore the property to its condition prior to the trainwreck and toxic discharges, plus the value of their lost use of the property as a result of Norfolk Southern's negligence.

122.   Plaintiff suffers and will continue to suffer decreased property values and loss of operating revenue as a result of Norfolk Southern's conduct.

123.   Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant imposing punitive damages.

### CLAIM 2: STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

124.   Plaintiff restates its previous allegations.

125.    At all times relevant to this action, Norfolk Southern was the owner and operator of Norfolk Southern Freight Train 32N.

126.    At all times relevant to this action, Norfolk Southern had supervision, custody, and control of Norfolk Southern Freight Train 32N.

127.    At all times relevant to this action, Norfolk Southern was under a continuing duty to protect the Plaintiff from the hazardous chemicals and materials.

128.    Norfolk Southern engaged in ultrahazardous activities by transporting hazardous chemicals and toxic pollutants.

129.    Norfolk Southern is responsible for the harm to Plaintiff, its land, and its property, as well as the harm to the properties from which Plaintiff derives operating revenue from property taxes, resulting from Norfolk Southern's ultrahazardous activity, regardless of whether it exercised the utmost care to prevent the harm. *See* Restatement (Second) of Torts §§ 519–520.

130.    Plaintiff has suffered harm from Norfolk Southern's toxic discharges emanating from Norfolk Southern's trainwreck and explosive discharge of toxic chemicals. The injuries sustained by Plaintiff and the properties from which it derives operating revenue as a result of the toxic discharge of hazardous chemicals that was the direct and proximate result of Norfolk Southern's activities.

131.    The harm to Plaintiff was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting hazardous and toxic chemicals in close proximity to residential, educational, commercial, and agricultural areas.

132.    Norfolk Southern's operations and resulting toxic discharges were and remain substantial factors in causing the harms suffered by Plaintiff.

133.    Additionally, Norfolk Southern was aware that its failure and/or disregard for having established plans, processes, and/or protocols for preventing and appropriately responding to the toxic discharge of hazardous chemicals—and, indeed, unnecessarily increasing such discharges to benefit its bottom line—would lead to the probable dangerous consequence of a sustained catastrophic event and harm or injury to the health and safety of Plaintiff and the community.

134.    As a direct and proximate result of Norfolk Southern's ultrahazardous activities, Plaintiff suffers and will continue to suffer decreased property values and resulting reduction in income from the property taxes on which it relies.

135.    As a direct and proximate result of Norfolk Southern's ultrahazardous activities, Plaintiff suffers and will continue to suffer loss of income tax on the lost wages suffered by community members.

136.    In failing to take protective measures to safeguard against the dangers, Norfolk Southern acted with a willful and/or knowing disregard of the probable dangers, and/or acted with an awareness of the probable dangerous consequences of its conduct and deliberately failed to avoid those consequences, thereby creating a substantial risk of injury to Plaintiff and the community of residents living near the trainwreck. Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's and the community's rights. Plaintiff is entitled to punitive and exemplary damages in an

amount to be ascertained, which is appropriate to punish or set an example of Norfolk Southern and deter such behavior by it and others in the future.

### CLAIM 3: BREACH OF CONTRACT (COMMUNITY WELLNESS CENTER)

137.  Plaintiff restates its previous allegations.

138.  On or about May 10, 2023, Plaintiff entered into an oral contract with Norfolk Southern to construct a Community Wellness Center on Plaintiff's property.

139.  In furtherance of its public statements that it would "make it right" to the East Palestine community, Norfolk Southern partnered with Plaintiff to construct a Community Wellness Center for the joint benefit of the East Palestine community and Plaintiff.

140.  In offering to fund construction of a Community Wellness Center, Norfolk Southern additionally sought to remedy public perception of the company after causing the derailment disaster.

141.  Norfolk Southern offered to fund the construction of a Community Wellness Center on land owned by Plaintiff to remedy the damage to Plaintiff's property, damage to public perception of Plaintiff and the larger East Palestine community, and the loss of revenue to the School District.

142.  Plaintiff, in turn, accepted Norfolk Southern's offer and agreed that its property would be used as the location of the Community Wellness Center.

143.  Plaintiff answered Norfolk Southern's call by convening a Steering Committee to make recommendations on the Community Wellness Center's construction and offerings, and gathered local community members and business owners to populate the community center with programs and services.

144.     Norfolk Southern partially performed its promise to construct a Community Wellness Center by hiring a construction company and architecture firm to design the Community Wellness Center and by hiring a land-assessment service to survey the property for construction.

145.     A reasonable person would find that Norfolk Southern's partial performance of its contractual obligations manifested a present intention to be bound to an agreement.

146.     Plaintiff performed its obligations under the contract.

147.     Norfolk Southern breached the contract by failing to fund construction of the Community Wellness Center.

148.     Plaintiff has been directly and proximately harmed, and will continue to be harmed, by Norfolk Southern's breach, including but not limited to diminution in property values, lost wages, loss of business income, damage to reputation, and loss of goodwill.

### CLAIM 4: PROMISSORY ESTOPPEL (COMMUNITY WELLNESS CENTER)

149.     Plaintiff restates its previous allegations.

150.     Norfolk Southern made a clear and unambiguous promise to Plaintiff to engage contractors and fund the construction of a Community Wellness Center, to be constructed on property owned by Plaintiff.

151.     The Community Wellness Center was intended for the joint benefit of Plaintiff and the East Palestine general community as part of Norfolk Southern's promise to "make it right" to Plaintiff and the community of East Palestine.

152. The Community Wellness Center was intended to combat the exodus of families and residents leaving the East Palestine Schools and surrounding communities.

153. The Community Wellness Center was necessary and needed to address a variety of needs of East Palestine students and residents relating to accessibility to quality healthcare, related wellness services, and workforce development training with complete onsite community resources.

154. The Community Wellness Center was intended to provide academic programming and training to K-12 students, including but not limited to skilled trades pre-apprenticeship programs, STEM classes, entrepreneur and leadership classes, a career-based intervention program, as well as a variety of student athletic programs.

155. On information and belief, the Community Wellness Center was, form Norfolk Southern's perspective, intended to improve public perception of the company that had devastated the East Palestine community.

156. On or about May 2023, in furtherance of Norfolk Southern's promise, Norfolk Southern engaged a contracting company, DeSalvo Construction, and architecture firm to provide a written assessment of the costs associated with building the Community Wellness Center and relocating the athletics facilities.

157. Norfolk Southern and Plaintiff toured similar facilities in surrounding school districts to see other community centers constructed by the contractor Norfolk Southern chose for the project.

158.   On or about June 26, 2023, Norfolk Southern produced DeSalvo Construction's design proposal to Plaintiff for review.

159.   On October 30, 2023, Norfolk Southern requested access to school property for testing and assessments to ensure environmental feasibility of constructing the Community Wellness Center on Plaintiff's property.

160.   Relying upon Norfolk Southern's promise, Plaintiff granted the requested access by executing an access agreement with Norfolk Southern.

161.   On or about January 2024, Norfolk Southern directed Plaintiff to assemble a steering committee to provide community input on the construction of the Community Wellness Center and gather agreements from local businesses to populate the Community Wellness Center.

162.   Relying upon Norfolk Southern's promise, Plaintiff assembled the committee, consisting of twenty-seven members, and gathered agreements from twenty-four businesses, programs, and institutions to be part of the Community Wellness Center.

163.   The steering committee met on at least three occasions between January and March 2024.

164.   On January 11, 2024, Norfolk Southern sent a map of the proposed construction site depicting the location of the Community Wellness Center.

165.   On March 15, 2024, Plaintiff requested an update from Norfolk Southern on the Community Wellness Center. An employee of Norfolk Southern replied that they "have not forgotten that we owe you an update," "will work to get

you an update soon so you can keep the conversation moving on your side," and requested the list of business partners lined up to be a part of the Community Wellness Center.

166.   Norfolk Southern partially performed its promise to construct a Community Wellness Center by hiring a construction company and architecture firm to design the Community Wellness Center and by hiring a land-assessment service to survey the property for construction.

167.   Plaintiff reasonably relied on these actions and statements from Norfolk Southern that the Community Wellness Center would be constructed.

168.   Plaintiff's reliance on Norfolk Southern's promise was foreseeable, given Norfolk Southern's representations and conduct in furtherance of constructing the Community Wellness Center and Norfolk Southern's consistent and unequivocal statements to the public and government officials, including, *e.g.*, its statements on its www.NSMakingitRight.com website that it was going to "SEE THIS THROUGH" and be "HERE FOR THE LONG HAUL" to "ENSURE THE AREA RECOVERS AND THRIVES."

169.   To date, Norfolk Southern has failed to perform on its promise to construct the Community Wellness Center.

170.   Plaintiff relied on Norfolk Southern's promise and has not utilized the property earmarked for the Community Wellness Center.

171.   Plaintiff relied on Norfolk Southern's promise and partial performance to its detriment. Plaintiff's standing in the community has been damaged because of

the failure to construct a Community Wellness Center on school property. Plaintiff has, and will continue to, lose revenue due to the exodus of students from East Palestine, which the Community Wellness Center was intended to remedy.

172.    Norfolk Southern's promise must be enforced to avoid injustice to Plaintiff.

173.    Plaintiff has been directly and proximately injured because of its reliance on Norfolk Southern's promise, including but not limited to diminution in property values, lost wages, loss of operating income, damage to reputation, and loss of goodwill.

## CLAIM 5: QUANTUM MERUIT

174.    Plaintiff restates its previous allegations.

175.    Plaintiff conferred a benefit upon Norfolk Southern by allowing Norfolk Southern to utilize its facilities and staff to provide services to evacuated East Palestine residents during the derailment disaster.

176.    Norfolk Southern sought this benefit from Plaintiff at least in part to remedy its public perception in the immediate aftermath of the derailment disaster.

177.    Norfolk Southern knew of the benefit conferred upon it by Plaintiff.

178.    Norfolk Southern retained the benefit, such that it is unjust to do so without payment.

179.    Plaintiff has been directly and proximately injured by the retention of the benefit by Norfolk Southern, including but not limited to diminution in property values, loss of operating income, damage to reputation, and loss of goodwill.

### CLAIM 6: PROMISSORY ESTOPPEL (DISASTER REIMBURSEMENT)

180.    Plaintiff restates its previous allegations.

181.    Norfolk Southern made a clear and unambiguous promise to reimburse Plaintiff for all costs Plaintiff incurred relating to damage from the derailment disaster.

182.    Norfolk Southern additionally made a clear and unambiguous promise to reimburse Plaintiff for costs relating to the need for increased virtual learning services for students who would not be able to attend in person classes due to damage from the derailment.

183.    Plaintiff reasonably relied on Norfolk Southern's promise to reimburse it for increased virtual learning services by paying staff wages and paying increased fees to a virtual learning vender to provide those services.

184.    Plaintiff's reliance on Norfolk Southern's promise was foreseeable, given Norfolk Southern's representations and conduct.

185.    To date, Norfolk Southern has failed to perform on its promise to reimburse Plaintiff for costs relating to the derailment and virtual learning services.

186.    Norfolk Southern's promise must be enforced to avoid injustice to Plaintiff.

187.    Plaintiff reasonably relied on Norfolk Southern's promise to reimburse for costs and provided access to Plaintiff's facilities, equipment, vehicles, and staff to assist in evacuating and housing East Palestine residents during and immediately after the derailment.

188.    Plaintiff's reliance on Norfolk Southern's promise was foreseeable, given Norfolk Southern's representations and conduct.

189.    To date, Norfolk Southern has failed to perform on its promise to reimburse Plaintiff for costs relating to the derailment and access to Plaintiff's facilities, equipment, vehicles, and staff to assist in evacuating and housing East Palestine residents during and immediately after the derailment.

190.    Norfolk Southern's promise must be enforced to avoid injustice to Plaintiff.

191.    Plaintiff incurred costs relating to the derailment disaster, including but not limited to staff wages and time, use of Plaintiff's facilities, and damage to Plaintiff's equipment.

192.    Plaintiff incurred costs relating to the increased need for virtual learning services, including but not limited to staff wages and virtual learning vender expenses.

193.    Plaintiff was not able to secure full reimbursement from State and federal emergency-relief sources because of Norfolk Southern's representation that it would cover those costs.

194.    To date, Norfolk Southern has not reimbursed Plaintiff for all costs incurred and that will be incurred as a result of the derailment disaster.

## CLAIM 7: STATUTORY NUISANCE

195.    Plaintiff restates its previous allegations.

196.    Section 112 of the federal Clean Air Act includes vinyl chloride in the list of hazardous air pollutants and sets a national emission standard. 41 Fed. Reg. 46560.

197.    Under Ohio Rev. Code § 3704.03, "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

198.    Norfolk Southern's trainwreck, fire, intentional ignition of vinyl chloride, and resulting toxic discharges emitted dangerous amounts of vinyl chloride and other hazardous chemicals into the air in and surrounding the properties of Plaintiff and the community.

199.    As a direct and proximate result of Norfolk Southern's acts and omissions described above, Plaintiff's property was exposed to hazardous air pollutants in violation of State and federal law.

200.    Exposing the Village of East Palestine and its School District to toxic chemicals resulted in a continuing negative perception of the community, resulting in it being viewed as a less desirable place to live and resulting in past and likely future relocations of residents.

201.    Exposing the Village of East Palestine and its School District to toxic chemicals resulted in a continuing negative perception of the community, resulting in it being viewed as a less desirable place to attend school and resulting in past and likely future withdrawal of students from the School District.

202.    Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant imposing punitive damages.

### CLAIM 8: WANTON AND WILLFUL MISCONDUCT

203.    Plaintiff restates its previous allegations.

204.    Norfolk Southern had a duty to Plaintiff to refrain from wanton or willful misconduct.

205.    On information and belief, Norfolk Southern was aware that it was transporting substances that were highly toxic, carcinogenic, or otherwise harmful to human beings, animals, and the environment.

206.    Norfolk Southern was aware that transporting, releasing, and igniting substances that were highly toxic, carcinogenic, or otherwise harmful to human beings, animals, and the environment could result in unreasonably dangerous emission of hazardous materials into the surrounding areas.

207.    Norfolk Southern knew or should have known that at least one railcar was malfunctioning and/or on fire for at least 20 miles before the trainwreck.

208.    Despite its knowledge, and contrary to federal and standard industry practices and procedures, Norfolk Southern breached its duties as described in Claim 1 above.

209.    Norfolk Southern's decision to vent and burn the vinyl chloride cars was motivated by its desire to resume rail operations as quickly as possible rather than by any actual risk posed by the vinyl chloride tanks (which were consistently down-trending in temperature). Norfolk Southern elevated considerations of its bottom line

above the harm it would permanently cause the East Palestine community and its School District through the vent-and-burn plan.

210. Through its actions and omissions described above, Norfolk Southern failed to exercise any care toward Plaintiff, to whom it owed a duty of reasonable care. This failure to exercise any care occurred under circumstances for which the probability of harm was great and the probability of harm was known to Norfolk Southern.

211. Through its actions and omissions described above, Norfolk Southern intentionally deviated from a clear duty or definite rule of conduct, acted with a deliberate purpose not to discharge a duty necessary to safety, or purposely performed wrongful acts with knowledge and appreciation of the likelihood of resulting injury.

212. As a direct and proximate result of Norfolk Southern's wanton and willful misconduct, Plaintiff has suffered and continues to suffer harm, injury, and losses, including physical injury to property, loss of use and enjoyment of its property, and diminution in property values, lost wages resulting in lower operating revenue, loss of income, loss of reputation, and loss of goodwill.

213. Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant imposing punitive damages.

### CLAIM 9: INDUCING PANIC THROUGH DISORDERLY CONDUCT UNDER OHIO REV. CODE §§ 2307.60, 2917.31, AND 2917.11

214. Plaintiff restates its previous allegations.

215.    Ohio Rev. Code § 2917.31(A)(3) provides that "[n]o person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by doing any of the following: . . . [c]ommitting any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm."

216.    Ohio Rev. Code § 2917.11(A)(4) prohibits "[h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender."

217.    Ohio Rev. Code § 2917.11(A)(5) prohibits "[c]reating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender."

218.    Through the acts and omissions described above, Norfolk Southern induced panic through disorderly conduct.

219.    Norfolk Southern had no lawful or reasonable purpose in derailing the train.

220.    Norfolk Southern had no lawful or reasonable purpose in releasing and igniting thousands of pounds of toxic chemicals into the environment.

221.    Under Ohio Rev. Code § 2307.60(A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or

another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code."

222.    As a direct and proximate result of Norfolk Southern's unlawful actions in derailing the train and implementing the vent-and-burn plan, Plaintiff suffered and continues to suffer harm.

223.    Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant imposing punitive damages.

### REQUEST FOR RELIEF

Plaintiff requests judgment against Defendants as follows:

A.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiff, including all relief allowed under applicable laws;

B.    For payment of attorneys' fees and expenses as may be allowable under applicable law;

C.    For both pre-judgment and post-judgment interest on any amounts awarded;

D.    For punitive damages, according to proof;

E.    For injunctive and declaratory relief, as allowed by law; and

F.    Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 30, 2025          Respectfully submitted,

_____

Ashlie Case Sletvold (0079477)
Caroline Ford (0101360)
**PEIFFER WOLF CARR KANE
  CONWAY & WISE, LLP**
6370 SOM Center Road, Suite 108
Cleveland, OH 44139
216-589-9280
asletvold@peifferwolf.com
cford@peifferwolf.com

*Attorneys for Plaintiff*